Courtnéy Campbell, Appellant, *v.* The State of New York, Respondent.

(Claim No. 22197.)

Third Department, March 15, 1934.

*Robert H. Elder* [*John H. Jackson* and *Otho S. Bowling* of counsel], for the appellant.

*John J. Bennett, Jr., Attorney-General* [*Leon M. Layden, Second Deputy Attorney-General,* of counsel], for the respondent.

HEFFERNAN, J. This litigation arises out of a contract dated May 9, 1931, between the State of New York, acting through the Taconic State Park Commission, and claimant. The project involved was the dredging of Rudd pond in the town of Northeast, Dutchess county, by excavating mud and silt therefrom in order to better the swimming beach in front of the bath house.

To ascertain the intention of the parties in making their agreement it is important to scrutinize their preliminary negotiations. In September, 1930, the Commission was desirous of doing the work in question. It had no appropriation for that purpose. Its chief engineer requested claimant to inspect the proposed work and estimate its probable cost. Claimant did so and as a result of his survey and computation the Legislature, by chapter 21 of the Laws of 1931, appropriated the sum of $19,000 to do the dredging. The amount of the appropriation was of considerable significance in the light of subsequent events. Of like importance is the fact that the State's engineer estimated the material to be dredged at 30,000 cubic yards.

The State advertised for proposals to do the dredging and after bids were submitted it was found that claimant's was low. He

obligated himself to do the work at a price of fifty-four and one-half cents per cubic yard. It is worthy of comment that the next low bid was one dollar and nineteen cents per cubic yard and the high bid two dollars and fifty cents per cubic yard.

Claimant was awarded the contract and entered upon performance thereof. It is his claim that he dredged 31,260 cubic yards and thus became entitled to receive from the State the sum of $17,036.70. The State contends that but 15,183 cubic yards of material were excavated, amounting to $8,274.73. Claimant was actually paid $6,022.25. He instituted this action to recover the balance claimed to be due amounting to $11,014.45. The court below adopted the State's view and gave claimant judgment for $2,385.93. From that judgment he. has come to this court.

The questions involved in this controversy relate to the quantity of material dredged and a construction of the contract.

The only provision of the contract which need concern us in its interpretation is that relating to measurement which reads:

" Payment. The quantity of fill to be paid for shall be the number of cubic yards measured in final position after shrinkage, sinkage and settlement, actually placed within the limits shown on the drawings or ordered placed by the Engineer, measured from the original surface of the area filled. The contract price for fill shall include the cost of all labor and materials, the use of all plant, machinery, tools and equipment and operating expenses incidental to doing all dredging and filling as specified and the performance of all work to the satisfaction of the Engineer."

It should be borne in mind that the material excavated was soft mud which was to be deposited on a marsh, composed also of like material, at the head of the lake. On the trial the State conceded that the disposal area was " very unstable." The State engineer assumed that the deposited material would remain in place on the marsh. The proof shows that it did not but some of it crept back into the lake. In his endeavor to confine the soft mud on the disposal area claimant constructed a dike. The dike did not hold. Logs were then forced to a depth of eighteen feet into the soft mud. Sheathing up to twenty-four feet long was driven into it without striking bottom. Notwithstanding these efforts, the dredged mud did not remain upon the marsh. The mud which flowed under the dike reappeared in the lake bottom and covered an area of at least 150 square feet. The dike constituted no adequate barrier because the material beneath was too soft. The engineer had not anticipated this seepage; he had obtained no data which would enable him to measure the quantity of excavated mud which had thus left the disposal area. Consequently he could not and did not measure

it although this mud represented material which claimant had dredged and deposited in accordance with the contract.

The mud was dredged from the lake bottom with a clam-shell bucket and placed in scows which were towed to the disposal area. Claimant's proof shows that 521 scow loads of material, each load being the equivalent of about seventy yards of mud, were thus deposited at the place provided. While the State does not concede the correctness of these figures we are convinced that they are in accord with the great weight of the evidence. The weight of the deposited material was tremendous and we can readily understand that the soft mud of the marsh was greatly compressed and its original surface forced into a new location.

Claimant was assured by the engineer that the material excavated would be measured in such a way that he would be fully compensated for his labor. There are two methods of making this measurement according to accepted engineering practice. One method is known as the survey measurement, which consists in surveying the material after disposal and calculating the cubic content accordingly. The other means is known as the conversion method, which consists of converting scow or truck measurement into fill measurement or place measurement by applying an accepted engineering formula. The standard formula used by the United States government, when the material to be measured is anything other than rock, is that nine yards in the scow shall be deemed eight yards in place. The first method was not practical in this instance. Once the work was under way it is apparent that both engineer and contractor relied upon the scow measurement theory. They used it as the work progressed. Therefore, irrespective of the provision in the contract relating to measurement it conclusively appears that the accredited representative of the State and claimant modified the same and adopted as their guide the scow method. Neither may now be permitted to repudiate that modification.

Although the measurement provision in the contract requires that cubic yardage shall be " measured in final position  *  *  * from the original surface of the area filled " it does not limit the engineer to any particular method of measurement, save for the implied condition that the method adopted shall be reasonably adequate. Not only was he not prohibited from using the conversion method, but by implication, according to claimant's expert witness, he was required to do so if no other procedure was reasonably certain.

From the evidence in this case the only reasonable explanation of the discrepancy between the State's and the contractor's figures

as to the quantity of material excavated is that the State engineer failed to obtain sufficient data from which correct calculations could be made and that in making his estimate he misconstrued the contract. The contract required him to measure " from the original surface of the area filled," that is, from the *surface of the original material of the marsh*, no matter how far it might have been depressed by the weight of the new material upon it. The engineer regarded the location of the " original surface " as unimportant. . He measured from the *place* where the " original surface " *had been* before the work began, with the result that the dredged material which was in final place *below* this original surface was not measured. The learned Deputy Attorney-General contends payment shall only be made for the number of cubic yards measured " after shrinkage, sinkage and settlement." This construction entirely ignores the remainder of the sentence which appears in the quoted provision of the contract.

There is another incident, very convincing indeed, which leads to the conclusion that the contractor's claim is a just one. The State engineer conceded that up to the moment the final figures came in he believed that claimant had fully performed his contract and had moved substantially 30,000 cubic yards. Thereupon he reversed his position because his own " surprising " figures showed a different result. In its cross-examination of claimant the State established that the work which he performed under this contract cost him $19,000.

The learned court below frankly stated that the result at which it arrived is a " harsh " one for claimant. Nevertheless, it felt impelled to uphold the State's position because although " the contract provision defining the method of measurement was difficult of performance " yet claimant might have " anticipated " this difficulty and, therefore, " guarded against " it. The fundamental error of this view is that whether the survey measurement " was difficult of performance " or not, the State assumed the obligation of having its engineer do it. It was not the obligation of the contractor to measure. The contract assured him that that very thing would be done, the difficulties overcome, and thereby a reasonably accurate result obtained.

Undoubtedly the provision in the contract as to measurement is ambiguous. It should, however, be reasonably construed. The decision under review deprives claimant of the fruits of his labor. Simple justice, fair dealing and common honesty alike demand that we should not give judicial sanction to such a result. Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can

be ascertained from their language. Where the language of a contract is contradictory, obscure or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted. (6 R. C. L. 841.) The words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one, and the court will likewise endeavor to give a construction most equitable to the parties, and which will not give one of them an unfair or unreasonable advantage over the other. So that interpretation which evolves the more reasonable and probable contract should be adopted, and a construction leading to an absurd result should be avoided. (13 C. J. 540, 541.)

Every contract implies good faith and fair dealing between the parties to it. The courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable, and especially one that will place one of the parties at the mercy of the other. (*Simon* v. *Etgen*, 213 N. Y. 589.) "Contractual obligations are fixed solely by the parties, and the language of a business contract must be construed in the light of what a business man would reasonably expect to give or receive, to perform or suffer, under its terms." (*Shirai* v. *Blum*, 239 N. Y. 172.) "In the transactions of business life, sanity of end and aim is at least a presumption, albeit subject to be rebutted." (*Outlet Embroidery Co.* v. *Derwent Mills*, 254 N. Y. 179.) A contract will not be construed so as to render it oppressive or inequitable as to either party, or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the agreement was made. (*Woods* v. *Postal Telegraph-Cable Co.*, 205 Ala. 236.)

Who can doubt when this contract was executed that it was the intention of the parties to pay claimant for the material excavated? That intention has not been consummated. The People of the State are not willing to deprive a citizen of his due.

Guided by the principles of law to which we have referred in construing the contract before us it is our conclusion that this case should be returned to the trial court for the reception of any additional proof which the parties may desire to give as to the number of cubic yards dredged, taking into consideration the original surface of the area filled after it had been depressed by the weight of the material placed thereon. In this way justice will be done to both parties and injustice to neither.

The judgment appealed from is, therefore, reversed, with costs to appellant to abide the event, and the cause remitted to the Court of Claims to be there disposed of in accordance with this opinion.

HILL, P. J., RHODES, CRAPSER and BLISS, JJ., concur.

Judgment reversed on the law and facts, with costs to the appellant to abide the event, and the cause remitted to the Court of Claims for further proceedings in accordance with the opinion of this court. The court reverses findings of fact numbered 19, 20, 21 and 22. The court also disapproves of and reverses conclusion of law numbered 1.