STARLING REALTY CORPORATION, Claimant, *v.* THE STATE OF NEW YORK, Defendant.
(Claim No. 25342.)

Court of Claims, June 24, 1940,

*Alfred S. Schechter*, for the claimant.

*John J. Bennett, Jr., Attorney-General [Jacob S. Honigsbaum, Assistant Attorney-General*, of counsel], for the defendant.

MURPHY, J. In 1937 the claimant Starling Realty Corporation was the owner of an office building on Spring street in the village of Ossining, N. Y. Sometime prior to October in that year, the State sought to lease a portion of the building for the use of the State Division of Placement and Unemployment Insurance. In order to make the building adaptable to such use, certain structural

alterations were necessary; they were made by the claimant; they involved an expenditure of about $1,200.

After these alterations were made, and on October 11, 1937, with due formality, a lease in writing was made and executed between the claimant and the State for about 1,300 square feet of floor space in the building. The term of the lease was for a period of three years commencing on November 15, 1937, and ending on November 14, 1940. The annual rent reserved was $2,200, payable in equal monthly sums of $183.33 at the office of the claimant.

Paragraph 17 of the lease created a limitation on the term of the lease. It provided: " The contract of the State hereunder shall be deemed executory only to the extent of moneys available to the Superintendent of Public Works for the leasing of said premises and that no liability shall be incurred by the State beyond the moneys available for such purpose."

Under this lease the State entered into possession of the premises in November, 1937, and continued in occupation thereof until about July 31, 1938, when, after a notice continued in a letter dated June 29, 1938, it vacated, and notwithstanding reasonable effort thereafter made by the claimant to relet the premises, they were idle at the time of the filing of this claim, which is filed for the sum of $733.33, being rent claimed to be due under the terms of the lease for the months of August, September, October and November, 1938.

The clause contained in the lease, " That the contract of the State thereunder shall be deemed executory only to the extent of moneys available and no liability shall be incurred by the State beyond the moneys available for the purpose," was written in the lease by command of the statute, section 3, subdivision 7, of the Public Buildings Law, which required that each such lease executed by the State should contain such a clause.

That this clause created a condition precedent and a limitation upon the term does not seem to be questioned. The complaint of the claimant appears to be that there was not an honest exercise of the condition, that moneys were in fact available for the rent of the premises, that the cancellation of the lease was not in good faith and that it was prompted by ulterior motive.

From these claims two questions are presented for examination: One, the question as to whether or not moneys were in fact available, and, two, the conduct of the State in terminating the lease.

These claims make necessary a short review of the means and manner by which the funds are created and then a consideration of the conduct of the State in canceling the lease.

To a °correct solution of the claim that moneys were in fact available, the Federal Social Security Act and the State Unemployment Insurance Law must be read and considered together and likewise consideration must be given to the setup and agreements made between the Federal and the State governments for the operation and administration of these acts.

It may be helpful to the discussion to point out that prior to the enactment of the United States Social Security Act, the New York State Employment Service received from the Legislature annually between $300,000 and $320,000, and under the Wagner-Peyser Act, the New York State Employment Service received an equal sum, so that the New York State Employment Service had available for its purposes about $600,000.

The Social Security Act appropriated the sum of $49,000,000 for the fiscal year ending June 30, 1939, and for each fiscal year thereafter $80,000,000 to be used as in the act provided (U. S. Code, tit. 42, § 501).

Section 502 of the act provides for payments to States and computation of amounts. It reads:

" (a) The Board shall from time to time certify to the Secretary of the Treasury for payment to each State which has an unemployment compensation law approved by the Board under the Federal Unemployment Tax Act, such amounts as the Board determines to be necessary for the proper and efficient administration of such law during the fiscal year for which such payment is to be made. The Board's determination shall be based on (1) the population of the State; (2) an estimate of the number of persons covered by the State law and of the cost of proper and efficient administration of such law; and (3) such other factors as the Board finds relevant."

Section 503 of the act specifies causes for stopping payments and paragraph (2) of subdivision (c) thereof specifies as a cause, " That such State is failing to afford reasonable cooperation with every agency of the United States charged with the administration of any unemployment insurance law."

The provisions of the State Unemployment Insurance Law (Labor Law, §§ 500–539) which are pertinent and which are related to the provisions of the Social Security Act above referred to, are to be found in section 514, which creates an unemployment insurance fund; subdivision 2 of section 518, which gives the State Industrial Commissioner power to establish and maintain as many State employment offices as he deems necessary; subdivision 5 of the same section, that gives him power to divide the State into such number of employment districts as he finds necessary and

which carries a direction that he shall maintain a district office in each of the districts; section 520, which provides for the administration of the fund; section 525, which provides for the expenses of administration, and section 529, which defines the extent of the liability of the State and in this respect provides: " The State of New York undertakes the administration of such fund without any liability on the part of the State beyond the amount of moneys received through allotment from the Federal Social Security Board or other Federal agency."

The Division of Placement and Unemployment Insurance was created for the purpose of administering the Unemployment Insurance Law. By a lump sum appropriation, the Legislature of 1938, by chapter 20 of the Laws of that year, appropriated the sum of $304,916 for use by that Division for expenses of maintenance and operation including personal service for the fiscal year beginning July 1, 1938, and the Federal government on the basis provided in section 502 of the Social Security Act granted to the State for use in the administration of the law between $5,500,000 and $6,000,000.

The appropriation made by the State was made under an agreement made between the State and Federal government in which the State agreed to turn over to the Federal Social Security Board the sum appropriated by the State and likewise the grant made by the Federal government to the State, for use in the administration of the law and in consideration thereof the Federal Social Security Board agreed to furnish all the funds necessary to operate the combined State Employment Service and the Bureau of Unemployment Compensation for personal service, rent and equipment.

The agreement required the Division of Placement and Unemployment Insurance to submit to the United States Bureau of Unemployment Compensation quarterly a form of requisition and itemized line budget; it was passed upon by the Bureau; the Bureau might allow it in its entirety, or it might disallow any item of it: there could be no deviation from it as allowed.

From the provisions of the law, particularly paragraph (2) of subdivision (c) of section 503, and the agreement, it is very obvious that the Federal government intended to control the distribution of the fund, and when the amount of its contribution is considered, the intention cannot be said to be unreasonable.

Conforming to this agreement, the Division of Placement and Unemployment Insurance submitted its budget covering the quarters January 1 to March 31, 1938, and April 1 to June 30, 1938. Each of these budgets carried a line item for the rent of claimant's premises. Both these budgets were approved by the

Federal Social Security Board and the rent for the periods was paid.

On June 1, 1938, the Federal Social Security Board wrote the Division of Placement and Unemployment Insurance relative to continuing certain small offices, in number some seventeen, listing among them the Tarrytown but not the Ossining office. The letter as it relate~ to these offices is as follows: " During the discussion in Wash..igton, the problem of maintaining *small offices further* was considered. It has been recommended that careful consideration be given for the continuance of the following offices. If, in the opinion of the State officials, *any one or more of them should be continued after June 28, 1938, a full explanation as to the need of such office should accompany the budget request for the July 1–September 30, 1938 quarter.*"

This letter clearly indicates a determination of the Federal Social Security Board to discontinue some offices and implies that no future moneys will be allocated to their maintenance.

In a reply dated June 14, 1938, to this letter, the Division of Placement and Unemployment Insurance sets forth reasons for continuing some of the listed offices and concerning those to be discontinued it reads: " After a careful consideration of all the circumstances, the Administration has reached the conclusion that the following offices be closed as soon as the proper arrangements can be made." Four of the offices listed in the Federal Social Security Board's letter are named. The Ossining office is substituted for the Tarrytown office with the following explanation: " You will note that Ossining has been substituted for Tarrytown inasmuch as Tarrytown is the site of a large Industrial plant. The office in Tarrytown has an active file of more than 900 and an average weekly load of approximately 55."

These letters were followed by the letter of June 29, 1938, reference to which has earlier been made, sent to the claimant by the Division of Placement and Unemployment Insurance and in which it is said: " In view of that fact the necessary moneys are not and have not been made available with which to pay the rent for office space occupied by us in the building known as 3 Spring Street, Ossining, and pursuant to the provisions of paragraph designated ' Seventeenth ' of our lease with you covering that space, we beg to advise that we are cancelling said lease No. 4896 as of July 31, 1938."

The Federal Social Security Board approved the line item " Ossining (1 month only) $183.33," contained in the budget for the period beginning July 1, 1938, and ending September 30, 1938, and allocated the said sum for the rent of claimant's premises for the month of July and the rent for that month was paid claimant.

The provisions of the Federal and State statutes and the agreement made between the Federal and State governments defeat the contention of the claimant that moneys were available for the rent of its premises beyond the period for which rent was paid.

The fund created by the lump sum appropriated by the State and the Federal grant made to the State was definitely in the control of the Federal Social Security Board, and no moneys could be taken from the fund without the approval of the Board.

The contention of counsel, that at the time the State gave notice of its intention to terminate the lease of claimant's premises, new and additional offices were being created and existing offices were being enlarged, gives proof that moneys were available for the rent of claimant's premises does not appear to be sound.

" Available " as used in the statute cannot be construed to mean as long as any moneys might remain in the fund. It is employed in a restrictive sense and should be interpreted as usable for the proper and necessary administration of the law.

The power of the Board to provide necessary moneys for increasing the number of necessary offices or enlarging already existing offices would seem to be clear and it would seem equally clear that it could refuse to provide moneys for such offices as it might decide unnecessary in the administration of the law.

Within reasonable limits under the Federal and the State statutes and the agreement made between the Federal and the State governments, the Board had power to give or withhold moneys and its action would bind alike the State and all dealing with the State, and failing to provide moneys, as it did in this instance, would leave the State without available moneys and would operate to create the right in the State to terminate the lease.

The very apparent purpose of the provision found in section 529 of the Labor Law, " The State of New York undertakes the administration of such fund without any liability on the part of the State beyond the amount of moneys received through allotment from the Federal Social Security Board or other Federal agency," was to limit the liability of the State and to protect it in just such a situation as is here present.

It is fundamental that one dealing with the State or a municipal corporation is chargeable with notice of the limitations of their powers and authority, and in the case of *McDonald* v. *Mayor* (68 N. Y. 23, 27) it is said: " It is fundamental, that those seeking to deal with a municipal corporation through its officials, must take great care to learn the nature and extent of their power and authority." This case has been consistently followed and will be

found cited, as well as elsewhere, in *Union Car Advertising Co., Inc.*, v. *Collier* (232 App. Div. 591, 594) and *Robinowitz* v. *City of White Plains* (269 N. Y. 670, 672).

Further, to the claim that moneys were in fact available, some reference should be made to the difference between a lump sum appropriation and an itemized line appropriation. The lump sum appropriation leaves the allocation of the sum appropriated to the Board or body for whom the appropriation is made, while in the itemized line appropriation, the allocation or segregation is made by the Legislature. (*Nellis* v. *State of New York*, 204 App. Div. 176.)

There remains for consideration the question of the good faith of the State in terminating claimant's lease which is challenged by the claimant.

The only evidence offered to establish this contention is that the State substituted the Ossining office for closing after the Federal Social Security Board in its letter of July 1, 1938, suggested the Tarrytown office.

Offering no direct proof in support of his contention, counsel argues that the fact or circumstance of recommending the substitution would support an inference of bad faith on the part of the State. This position does not appear tenable.

The reason given by the State for the substitution is substantial. Both the Tarrytown office and the Ossining office were small offices and it is a reasonable assumption that the Division of Placement and Unemployment Insurance would be better informed on local affairs than the Federal Board. Apparently its information was used. It advised the Board that after careful consideration " You will note that Ossining has been substituted for Tarrytown inasmuch as Tarrytown is the site of a large industrial plant."

That the Federal Board accepted the recommendation for substitution bears strongly to support the good faith of the Division.

Finally, to this point, the State is favored by the legal presumption that no official will do any act contrary to his official duty or omit anything his official duty may require, and courts are bound to presume that everything done by an official was rightfully done until evidence to the contrary is produced. (*Matter of Whitman*, 225 N. Y. 1, 9; *Matter of Hirshfield* v. *Craig*, 239 id. 98; *Hood* v. *Guaranty Trust Co.*, 270 id. 17, 28.)

The conclusion is reached that moneys for the payment of the rent of claimant's premises were not in fact available and the State acted within its right and in good faith in terminating the lease. It follows the claim must be dismissed.

RYAN, J., concurs.