WHOLESALE SERVICE SUPPLY CORP., Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 29789.)

Court of Claims, April 4, 1951.

*Homer F. Peters* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Marvin P. Lazarus* of counsel), for defendant.

GORMAN, J. The present action arises out of the alleged breach of a contract between claimant, a domestic corporation, and the State of New York.

There is little dispute as to the facts. Prior to August 10, 1948, the State of New York, through the Division of Standards and Purchase, advertised for bids in connection with the contemplated procurement of twenty-two items of fencing, posts and accessories. Claimant's bids were accepted on several of these items, including item No. 18, which is our present concern. Item No. 18 embraced the purchase of wire fencing to be used by the Conservation Department in connection with a wildlife project at the Delmar Game Farm. The item was set forth in the proposal as follows: '' Item #18 Delmar Game Farm, Delmar, N. Y. WOVEN WIRE FENCE FABRIC (Galvanized), 2″ x 4″ mesh, top and bottom wires 9 gauge, filler wires 11 gauge. (Similar to Keystone Non-Climbable Fence) — (150 ft. Rolls) 36″ height — Quantity: 200 rolls Unit Price per roll: ——72″ height — quantity: 200 rolls — Unit Price per roll:——.''

In submitting its bid on the above item, claimant made certain alterations. '' WOVEN '' was crossed out and the words '' CLOSE MESH, WELDED '' were inserted. The figure '' 9 '' before '' gauge '' was replaced by the figure '' 11 '', and the figure '' 100 '' before '' ft. Rolls '' was substituted for the figure '' 150 ''. Upon returning its bid, claimant in an accompanying letter, made a part of its bid, called specific attention to item No. 18 as follows: '' Item #18 — We are quoting on close mesh welded wire fabric galvanized 2″ x 4″ mesh. All wires being 11 gauge. Also, please note that this material is furnished in 100 lineal feet rolls.''

Bids were opened on August 10, 1948, and an award and contract, dated October 1, 1948, and approved by the State Comptroller on October 6, 1948, was sent out to the claimant on October 11, 1948. The contract, by its terms, expired on March 31, 1949.

Item No. 18 in the award conformed to the alterations made by claimant with an additional change, made by the State agency preparing the award, in the '' quantity '' from '' 200 '' rolls for each height to '' 300 '' rolls, necessitated by the difference in the number of feet in the rolls. Upon receipt of the award and contract, claimant placed an order for the fencing,

which was not a stock item, but had to be specially fabricated, with the Pittsburg Steel Company. Deliveries to the claimant were made on October 23, 30, November 1, and December 2, 1948.

On November 17, 1948, the claimant requested the Delmar Game Farm to issue a delivery order for the fencing. No order was made, and on December 20, 1948, claimant contacted John T. Higgins, deputy commissioner of the Division of Standards and Purchase, about the failure to receive a delivery order. Claimant was referred to the Conservation Department, the agency which had initiated the request for the fencing. Deputy Commissioner Skiff of the Conservation Department informed claimant that the department required only thirty rolls of each size of the wire fencing. It thus became apparent to claimant for the first time, that an error had been made in setting up the quantity required — that the proposal and award had contemplated 600 rolls, or 60,000 feet, of fencing but that the actual requirement of the Conservation Department had been only 60 rolls, or 6,000 feet. On the same date the Conservation Department obtained an amended certificate of allocation from the Director of the Budget and subsequently placed delivery orders for only 120 rolls of fencing. The department refused to accept any additional quantity. Seventeen rolls of the material were later ordered by other State agencies, and the claimant through its own efforts eventually disposed of seven additional rolls of the thirty-six-inch material and nineteen rolls of the seventy-two-inch fencing. Claimant was unable to dispose of 437 rolls of fencing which the Pittsburg Steel Company refused to take back.

Under the procedure set up by the State for the purchase of material by a State agency, the purchasing agency sends a requisition of its needs to the Division of Standards and Purchase which, in the proper case, solicits bids and makes awards, sending out a formal notice of award, approved by the State Comptroller, to the successful bidder, a copy of which is forwarded to the purchasing agency. The purchasing agency then applies to the Budget Director for an allocation of funds to cover the contract. The allocation is then transmitted to the State Comptroller, and the Comptroller honors the purchase order if there are sufficient funds in the appropriation.

The fencing herein involved was required in a certain project, known as deer management research, a unit in the wildlife restoration project. This project was partly financed from an

appropriation made by the State, and partly from an advance appropriation made by the State to be reimbursed by the Federal Government in the amount of 75%. The appropriation was authorized by chapter 468 of the Laws of 1948 in the lump sum of $653,025.

The proposal and award, as shown above, set forth a specific quantity of fencing to be supplied by the claimant. There are certain clauses in the award and general specifications which must be construed to ascertain if such specific amount was in any way qualified. The following clause appears in the award in a section headed " Quantities ": " The quantities listed herein are based on requirements on file in the Div. of Standards and Purchase. The contract, however, is for quantities as actually ordered by any State Agency during the contract period."

The general specifications contained the following clause: " 39. Each bid will be received with the understanding that the acceptance thereof in writing by the Commissioner, approved by the Comptroller, to furnish any or all of the items described therein shall constitute a contract between the bidder and the State and shall bind the Bidder on his part to furnish and deliver at the prices and in accordance with the conditions of his bid; the State on its part to order from such contractor (except in the case of emergency) and to pay for at the contract prices, all items ordered and delivered, within ten (10) per cent over or under the award quantity."

In construing a contract, it is the province of the court to give effect to the whole contract and to reconcile all of its provisions if it is in any way possible to do so. (*Fleischman* v. *Furgueson,* 223 N. Y. 235; *Fox Film Corp.* v. *Hirschman,* 122 Misc. 354, affd. 212 App. Div. 837.) To give credence to the State's contention that the contract provided for conditional quantities and was only for such amounts as were actually ordered by the State agencies requiring the material would necessitate decreeing the contract unenforcible for want of certainty. It would, by such a construction, fall into that category of unenforcible contracts wherein the will, wish or want of one of the parties determines absolutely the quantity to be delivered (12 Am. Jur., Contracts, § 69, p. 560) because the State would be under no obligation to order any quantity at all if it did not choose. Such an interpretation would place the claimant entirely at the mercy of the State, and equity does not favor such a construction. (*Gillet* v. *Bank of America,* 160 N. Y. 549; *Russell* v. *Allerton,* 108 N. Y.

288; *Wright* v. *Reusens*, 133 N. Y. 298, 305; *Jugla* v. *Trouttet*, 120 N. Y. 21, 28; *Campbell* v. *State of New York*, 240 App. Div. 304.) It is to be presumed that the parties to a contract intended that meaning to prevail which would give effect to the contract. (*Matter of Marchant* v. *Mead-Morrison Mfg. Co.*, 252 N. Y. 284, 303.) We must thus acknowledge the function of the clause found in No. 39 of the general specifications which requires " the State on its part to order from such contractor (except in the case of emergency) and to pay for at the contract prices, all items ordered, and delivered, within ten (10) percent over or under the award quantity." Such clause gives sufficient certitude to the quantity which the buyer is required to accept, and does not subject the seller to the arbitrary whim of the buyer. By such a construction both the general and specific provisions of the contract function and each may be retained. (*Town of Tonawanda* v. *Stapell, Mumm & Beals Corp.*, 147 Misc. 768, revd. on other grounds 240 App. Div. 472, affd. 265 N. Y. 630.)

We do not believe the present contract falls within that line of cases stemming from *Brawley* v. *United States* (96 U. S. 168), which holds that where a specific quantity is qualified by such words as " about ", " more or less ", etc., and such qualified words are followed by other stipulations or conditions, the contract is to be governed by such conditions. The underlying reason for the development of such a theory of contract law in connection with government contracts arises from the fact that in procuring commodities for military establishments and like agencies, it is often impossible, because of changing conditions, to specify an exact amount, and to protect the public and the taxpayer from the needless dissipation of public funds an approximate quantity is denoted. (*Field* v. *United States*, 16 U. S. Ct. Cl. 434, 448; *Gemsco, Inc.*, v. *United States*, 115 U. S. Ct. Cl. 209.) In the present instance, the quantity found in the proposal and award was not qualified by the words "more or less" or words of similar import, and, in addition, under the conditions herein involved, there was no reason why the agency requiring the fencing would not be in a position to determine the exact quantity needed.

From a perusal of the proposal, award and contract, and from a study of the record, it is apparent that at the time the bid was submitted and the award made, each party believed that it was contracting, and intended to contract, for a specific quantity. Each thought that the amount set forth represented the exact requirements of the Conservation Department. True,

an error had been made by one party to the contract, the State, but the claimant was completely unaware of such error. The error was made entirely through the negligence of an agent of the State employed by the Division of Standards and Purchase, and was undetected, again through negligence, by the employees of the Conservation Department, the purchasing agency, although a copy of the award was sent to the department for examination at the same time that the award was forwarded to the claimant. In order to relieve a party from the effects of its unilateral mistake, it is imperative that the innocent party who had no knowledge of the mistake, and no reason to suspect its existence, must not have been prejudiced by any change in position he may have undergone in reliance on the contract. (*Harding* v. *Knapp,* 8 N. Y. S. 2d 224; *City of New York* v. *Dowd Lumber Co.,* 140 App. Div. 358.) Here, claimant had no knowledge of the error. The State's contention that claimant was under a duty to visit the Division of Standards and Purchase to check the requisition on file therein to assure itself that no clerical error had been committed in designating the quantity in the proposal and the award cannot be upheld. The contract did not require it and there was nothing patent on the face of the contract to put claimant on notice that an error had been made. There was no such uncertainty as to require the claimant to satisfy itself that the State had not been negligent in preparing the proposal and award. (*Young Fehlhaber Pile Co.* v. *State of New York,* 177 Misc. 204, affd. 265 App. Div. 61; *Jarcho Bros.* v. *State of New York,* 179 Misc. 795.) It would certainly not be conducive to the efficient operation of State agencies if one contracting with the State were required to go through such agency's records and files to ascertain that no clerical or other error had been committed by the State before he should be free to rely upon the terms set forth in the contract. Claimant here had a right to rely on the fact that the State in preparing a proposal and award would do so carefully and prudently. (*Shirai* v. *Blum,* 239 N. Y. 172, 181.)

Claimant did not learn that a mistake had been made in denoting the quantity of fencing required until December 20, 1948, after it had made a reasonable effort to procure delivery orders for the product. Prior to that time, all of the fencing material ordered from the Pittsburg Steel Company had been delivered to the claimant. The record shows, however, that sometime between October and December, the Conservation Department became aware of the error, but did not do anything

to apprise claimant of the mistake. Such conduct was not commensurate with the good faith required of the parties to a contract in their dealings with each other and constituted an unreasonable delay. (*Brandese* v. *City of Schenectady,* 194 Misc. 150, affd. 273 App. Div. 831, affd. 297 N. Y. 965.) The State, in carrying out the provisions of its contracts, is bound by the same rules of fair play and honesty that must prevail between individuals. (*People ex rel. Graves* v. *Sohmer,* 207 N. Y. 450.) '' The state is called upon, in contracting with its citizens, to set a standard which for fairness, justice, equity, honesty and plain, frank statement of its purpose, without subterfuge or circumlocution, shall be beyond all criticism as being in any way possible of deception.'' (*Atlanta Constr. Co.* v. *State of New York,* 103 Misc. 233, 236; *Jackson* v. *State of New York,* 210 App. Div. 115; *Danolds* v. *State of New York,* 89 N. Y. 36.)

We do not uphold the State's contention that it cannot be held liable for its mistake because it was not made by the purchasing agency which is responsible for the payment of the contract, but by the procuring agency which has no funds at its disposal. In an organization such as a governmental entity in which an operation must be performed by various agencies over which the other contracting party has no control, the entity must be held liable for an intrinsic error which is committed by one agency and carelessly disregarded by another participating agency. As stated in *Struck Constr. Co.* v. *United States* (96 U. S. Ct. Cl. 186, 221), '' It is difficult to apply terms with moral implications, such as ' good faith,' to impersonal legal entities such as corporations or governments, especially in situations where they act on one matter through a number of agents. Some of the moral qualities may be lost or diluted as the decision passes from one agent to another. But the test of good faith should be the same for an entity which must act through agents as for an individual acting for himself. If the aggregate of the actions of all the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. It is the responsibility of the entity, the principal, to so coordinate the work of its agents that the aggregate of their actions will conform to required legal standards.'' Ignorance of facts peculiarly within its knowledge cannot excuse the State any more than were it an individual and it must be bound by the same rules applicable to an individual

in similar circumstances. (*Young Fehlhaber Pile Co.* v. *State of New York,* 177 Misc. 204, affd. 265 App. Div. 61, *supra; Metzger* v. *Aetna Ins. Co.,* 227 N. Y. 411, 416.)

We are further of the opinion that the failure of the Conservation Department, after notice and after its discovery of the mistake, to make any effort to so inform the claimant may be held to constitute a ratification of the mistake. Where a party desires to rescind a contract upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. " If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." (*Grymes* v. *Sanders,* 93 U. S. 55, 62; *Dailey Mills* v. *State of New York* [Court of Claims], March 9, 1951.)

The State further relies on clause No. 57 of the general specifications and the decision of the Court of Appeals in *Starling Realty Corp.* v. *State of New York* (286 N. Y. 272, affg. 261 App. Div. 363, affg. 174 Misc. 375) as a defense to the claimant's action.

The pertinent clause reads as follows: " A contract shall be deemed executory only to the extent of funds available for payment of the amounts shown on purchase orders issued by the State Agencies to the Contractors."

The following features serve to distinguish the present claim from the *Starling* case. In the *Starling* case the functions of the State and Federal agencies in connection with the administration of unemployment insurance were combined, and all funds were held by the Federal agency and distributed only upon the submission of an itemized line budget. In the present instance, the Federal Government by Act of Congress entitled " An Act to provide that the United States shall aid the States in wildlife-restoration projects, and for other purposes " dated September 2, 1937 (50 Stat. 917; U. S. Code, tit. 16, § 669 *et seq.*) undertook to co-operate with the State Fish and Game Departments in furthering wildlife restoration projects. By the terms of the above Act and the State Act (L. 1938, ch. 683) enacted in compliance therewith, the State makes the entire appropriation, and is reimbursed to the extent of 75% of the full amount of the cost of such projects as shall be agreed upon by the Secretary of the Interior and the State Fish and Game Depart-

ment. The Federal Act further provides that the " Secretary of the Interior shall approve only such projects as may be substantial in character and design and the expenditure of funds hereby authorized shall be applied only to such approved projects and if otherwise applied they shall be replaced by the State before it may participate in any further apportionment under this Act." (U. S. Code, tit. 16, § 669e.)

If the Secretary of Interior finds that such project meets the standards set up by him and approves the project, the State Fish and Game Department shall furnish him such surveys, plans, specifications and estimates as he shall require.

In the present case there is no evidence as to whether the actual request for the fencing material was ever submitted to the Federal Government for approval, and if it was, in what amount. The State submitted no records on this point. For all that appears, the State was not required to obtain specific approval for the purchase of a specified amount of such an item as fencing, but needed only approval of the larger project entailing deer management which it had received. If specific approval was required, it may be that such approval for 600 rolls of fencing was obtained. Under such conditions, if a party having relevant evidence under his control, fails to produce such evidence, the inference may be permissible that such evidence would not be favorable to him. (*Galbraith* v. *Busch,* 267 N. Y. 230.) We are not, under the present circumstances, confronted with the declared public policy operating in the *Starling* case (*supra*). (*Nemo* v. *State of New York,* 178 Misc. 286.) There the Public Buildings Law required that the clause limiting the State's liability to funds actually available be inserted in every lease to which the State was a party, and there was a specific finding that no such funds were available. Here, we conclude that there was at all times sufficient funds in the appropriation from which an allocation could have been requested for the purchase of this material by the Conservation Department. There was no legal barrier that would prevent the State from honoring its commitment beyond the amounts approved by the Federal Government. The only hardship involved in such action, would be a possible curtailment of other wildlife projects pending restoration to the fund. If the State were able, under any conditions which it chose to bring into operation, to gain immunity from its contractual obligations by exercising the disputed clause, contracts with the State would be " turned into pure gambling transactions with the odds always in favor of

the Government '' (*Gemsco, Inc.,* v. *United States,* 115 U. S. Ct. Cl. 209, 230, *supra*) and eventually the State will go into the market for work and material at a disadvantage.

Claimant's proposed findings of fact Nos. 1 to 33, inclusive, are hereby found and made a part hereof. Judgment is accordingly directed in favor of the claimant and against the State of New York in the amount of $6,283.55, with interest from March 31, 1949. The foregoing constitutes the written and signed decision upon which judgment may be entered.